IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MOHAMED R. AL-'OWHALI,<br><br>    Plaintiff,<br><br>v.<br><br>DANIEL SPROUL and J. HUGHES,<br><br>    Defendants. | Case No. 25-cv-235-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Mohamed R. al-'Owhali, an inmate of the Federal Bureau of Prisons ("BOP") who is currently incarcerated at United States Penitentiary—Florence, brings this action pursuant to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, for deprivations of his rights while at United States Penitentiary—Marion ("USP—Marion"). In the Complaint, al-'Owhali alleges that Defendants interfered with the exercise of his religion.

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b).

1

## The Complaint

Mohamed R. al-'Owhali is a practicing Muslim with sincerely held Islamic beliefs (Doc. 1, p. 2). Al-'Owhali alleges that he was previously housed at USP—Florence Administrative Maximum ("ADX"), the supermax prison in Colorado (*Id.*). While housed at ADX and subject to severe restrictions on his communications and conditions of confinement, al-'Owhali alleges that he used various means to object to what he believed were illegal and harsh conditions including filing administrative remedies, suing the government, and conducting hunger strikes (*Id.* at pp. 2-3). He used hunger strikes as a last means of conveying his issues, only resulting to such a tactic when all other means of resolving his issues had failed (*Id.* at p. 3). Al-'Owhali notes that hunger strikes are not prohibited by federal regulation or BOP program statement and in fact there are special provisions in place in both the Code of Federal Regulations and BOP Program Statements regarding hunger strikes (*Id.*). Al-'Owhali alleges that pursuant to BOP Program Statements, involuntary medical treatment is only allowed when a physician determines that an inmate's life or health is threatened (*Id.* at p. 4). In the alternative, an inmate can be offered a liquid nutritional supplement, if authorized by a physician, and the acceptance of such is not documented as accepting a meal (*Id.*).

While at ADX, al-'Owhali alleges that he occasionally accepted the liquid nutritional supplement while on a hunger strike, including during the month of Ramadan. Al-'Owhali alleges that staff at ADX cooperated with him during religious holidays, allowing him to take the nutritional supplement before dawn and after sunset

so as to not interfere with his religious observation of certain fasts, like Ramadan (*Id.* at pp. 5-6).

After al-'Owhali transferred to USP—Marion, Warden Daniel Sproul allegedly violated al-'Owhali's rights by forcing him to break his fasts (Doc. 1, p. 6). In June 2021, al-'Owhali declared a hunger strike to protest what he saw as staff's attempts to force him out of his religion and/or murder him (*Id.*). On June 12, 2021, he had missed 45 meals and was scheduled for a medical evaluation. Eighteen days later, Dr. Pass, USP-Marion's Clinical Director, reviewed the hunger strike guidelines and determined that al-'Owhali needed medical intervention to avoid medical complications. As a result, al-'Owhali was forced to take two containers of Ensure on a daily basis (*Id.* at p. 7).

As the day of Arafah approached, a day of fasting held on July 19, 2021, al-'Owhali informed medical staff that he wanted to drink the nutritional supplement the evening prior to the fast in order to avoid breaking his fast (Doc. 1, p. 7). Dr. Pass submitted written authorization allowing al-'Owhali to consume two containers of Ensure the day before Arafah and two containers of Ensure the evening before Arafah in order to avoid feeding during the fasting day (*Id.*). Al-'Owhali alleges that he complied with all medical orders and drank the two additional Ensures the night prior to the fast.

On July 19, 2021, al-'Owhali met with a nurse, who took his vitals and informed him that based on the assessment and the clinical director's determination, al-'Owhali would not need force feeding (Doc. 1, p. 7). Later that same morning, however, the "Use of Force" team extracted al-'Owhali and took him to the healthcare unit where he was force fed by Nurse Hughes (*Id.* at pp. 7-8). Nurse Hughes informed al-'Owhali that he

3

was being force fed at the direction of Warden Sproul, who overruled Dr. Pass's assessment and directives. Hughes also informed al-'Owhali that Sproul's decision was not based on medical needs but was an attempt to leverage al-'Owhali's religious commitment and cause mental distress in order to push him off of his hunger strike (*Id.* at p. 8).

Al-'Owhali alleges that he spoke to Sproul on multiple occasions and Sproul expressed that he was willing to violate an inmate's religious rights to accomplish his goals at the prison (Doc. 1, p. 8). Al-'Owhali notes that on one occasion he complained to Sproul that he treated Muslims in the unit different than other religions, noting that Sproul labeled Muslim inmates as a disruptive and illegal group. Al-'Owhali also pointed out that some of his religious texts were banned because they regulated war and called for a society contrary to modern standards, when some Jewish texts also had violent proclamations, but inmates were allowed to receive the Jewish texts (*Id.* at pp. 8-10). Sproul acknowledged that he would not prohibit the Jewish texts and noted that if al-'Owhali renounced his religion and converted to ultra-orthodox Judaism, the BOP would remove his terrorist status and lower his security classification (*Id.* at p. 10). Sproul noted that al-'Owhali's religion was seen as a security threat and, due to public sentiment towards Islam, Sproul could use al-'Owhali's religion as leverage against him without fear of repercussion (*Id.* at p. 11). Sproul informed al-'Owhali that his hunger strike disturbed prison operations and Sproul would use his religion against him to stop his hunger strike (*Id.*).

After he was force fed, al-'Owhali alleges that Sproul approached him in his cell and reminded him that he would use his religion against him. He instructed al-'Owhali to follow orders, including stopping his hunger strike (*Id.* at p. 12). Al-'Owhali alleges that Sproul disrupted his fasting on eight to ten other occasions, three of which were during the most sacred fasting days (*Id.*). On each occasion, staff force fed al-'Owhali by forcing a feeding tube through his nose to his stomach and delivering a nutritional supplement (*Id.* at p. 13). Al-'Owhali alleges this action violated his fasting because it allowed a substance to enter his body during the fasting times (*Id.*). He also alleges that on each occasion, the force feeding was not done out of medical necessity but was done specifically to violate his religious fast and coerce al-'Owhali off of his hunger strike (*Id.*). These actions imposed a substantial burden on al-'Owhali and the observation of his religious beliefs (*Id.*).

Al-'Owhali alleges that Nurse Hughes participated in the violations of his religious rights because Hughes was the staff member who performed the force-feeding (*Id.* at p. 14). Hughes also acknowledged that he knew the force feeding was not based on medical need but rather on the orders of Warden Sproul to violate al-'Owhali's fast (*Id.*). Al-'Owhali alleges that Hughes acknowledged that his actions violated al-'Owhali's rights but he was just following the warden's orders so that he did not receive discipline (*Id.* at pp. 14-15).

## Discussion

Based on the allegations in the Complaint, the Court designates the following count

> **Count 1:** RFRA claim against Defendants Daniel Sproul and J. Hughes for placing a substantial burden on al-'Owhali's religious exercise by force feeding him during scheduled religious fasts.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard**.[1]

The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from imposing substantial burdens on the exercise of religion, absent a compelling interest pursued using the least restrictive means. *Tanzin v. Tanvir*, 592 U.S. 43, 45-46 (2020). "[A] substantial burden exists when the government compels a religious person to 'perform acts undeniably at odds with fundamental tenets of [his] religious beliefs.'" *Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). A person whose religious exercise has been unlawfully burdened may seek "appropriate relief" under RFRA. *Tanzin,* 592 U.S. at 48-49. This relief includes injunctive relief, against high-ranking officials in their official capacity, and money damages, against individual defendants in their individual capacities. *Id.* at 49-52. At this stage, al-'Owhali has adequately alleged that Sproul and

---

[1] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face").

Hughes substantially burdened the practice of his religion when they force fed him during his religious fasts.

## Disposition

For the reasons stated above, Count 1 shall proceed against Daniel Sproul and J. Hughes.

The Clerk of Court shall prepare for Daniel Sproul and J. Hughes: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons) and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendant's place of employment as identified by al-'Owhali. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by al-'Owhali, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. Section 1997e(g).

**Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order**.

If judgment is rendered against al-'Owhali, and the judgment includes the payment of costs under Section 1915, he will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, al-'Owhali is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* Fed. R. Civ. P. 41(b).

**IT IS SO ORDERED.**

DATED:  May 27, 2025

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

## Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your Complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to your Complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answer, but it is entirely possible that it will take **90 days** or more. When all the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. **Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.**